Cite as 2025 Ark. App. 447

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-23-476

|  |  |
|---|---|
| GRAND PRAIRIE FARMING & WATER CO., LLC; JERRY LEE BOGARD AS CO-MANAGER OF GRAND PRAIRIE FARMING & WATER CO., LLC; AND BOGARD AGRICULTURE CONSULTANCY GROUP, INC.<br>APPELLANTS | Opinion Delivered September 24, 2025<br><br>APPEAL FROM THE ARKANSAS COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 01SCV-22-181] |
| V. | HONORABLE DONNA GALLOWAY, JUDGE |
| BLACK FARMS, LLC; REBECCA WINEMILLER AS CO-MANAGER OF GRAND PRAIRIE FARMING & WATER CO., LLC; REBECCA WINEMILLER AS CO-TRUSTEE OF THE ERNESTINE BOYCE TRUST; AND ERNESTINE BOYCE AS CO-TRUSTEE OF THE ERNESTINE BOYCE TRUST<br>APPELLEES | REVERSED AND REMANDED |

**WAYMOND M. BROWN, Judge**

This case involves a complicated business venture that was dissolved by the circuit court on a motion for summary judgment. The motion for summary judgment was prematurely granted, and we reverse and remand.

## I. *Background*

Jerry Lee Bogard owns Bogard Agriculture Consultancy Group, Inc. ("Bogard Ag"). Rebecca Winemiller owns Black Farms, LLC ("Black Farms"). In January 2015, Grand Prairie Farming & Water Co., LLC ("Grand Prairie"), was formed with Black Farms and Bogard Ag as equal owners. Bogard and Winemiller became Grand Prairie's managers.

According to the operating agreement, the purpose of Grand Prairie is "to acquire, develop, own, operate[], manage and/or lease real and personal property and to pursue all lawful business activities for which limited liability companies may be organized according to the Act." The operating agreement also requires unanimous written consent of the managers for all major decisions.

Grand Prairie's one goal was for Bogard to develop what he called a "Groundwater Preservation/Sustainability Model" (the "Credit Model"): Grand Prairie would buy and develop tax and other credits for groundwater preservation, removal of nutrients from surface water, carbon mitigation, waterfowl-habitat creation, and other activities. As of the filing of this lawsuit, Grand Prairie had not sold any water or carbon credits. However, whether the credits were ready and able to be marketed is disputed, as is the value of the credits.

In March 2015, Grand Prairie purchased more than twelve thousand acres in Jefferson and Arkansas Counties as well as some equipment and other personal property that was located on that land. It borrowed approximately $67 million for the purchase, which was financed by Metropolitan Life ("MetLife"). Bogard, Winemiller, and

2

Winemiller's husband, Jimmy, all gave personal guarantees for this loan, and Winemiller mortgaged collateral. The payment on the MetLife loan is $3,447,203.99 and is due annually on April 5. Grand Prairie purchased other real property as well.

Grand Prairie generates income through leases and water sales and by periodically selling parcels of land. According to Bogard, he and Winemiller agreed from the beginning that they would periodically sell parcels of land that were not essential to the water business in order to produce income when needed until the Credit Model was fully developed and generating income. The company made many such sales of nonessential properties over the years. By the time this lawsuit was filed, Grand Prairie still owned approximately eight thousand acres.

In 2017, Grand Prairie needed funds for the MetLife loan payment and borrowed $1 million from the Ernestine Boyce Trust (the "Trust"). The Trust became the third owner in the company, and as a result of that transaction, Grand Prairie's ownership interests were distributed as follows: 47.5 percent to Bogard Ag; 47.5 percent to Black Farms; and 5 percent to the Trust. Ernestine Boyce is Winemiller's mother. Winemiller and Bogard continued to be Grand Prairie's only managers.

On November 18, 2022, Winemiller, Black Farms, the Trust, and Boyce (collectively, the appellees) sued Grand Prairie, Bogard, and Bogard Ag (collectively, the appellants) to dissolve Grand Prairie, appoint a receiver, and complete an accounting. The complaint was served on the appellants on November 28.

Shortly after service, on December 16, the appellees filed a motion for summary judgment on their dissolution and receiver claims. The appellants answered the complaint and responded to the motion for summary judgment on January 6, 2023.

The circuit court held a hearing on the motion for summary judgment on February 17. Although the circuit court did not rule on the summary-judgment motion at this February 17 hearing, it did appoint a temporary receiver. The order appointing the temporary receiver was entered on February 24. It allowed the temporary receiver to enter leases, water contracts, and other transactions on behalf of Grand Prairie, but it also stated the following:

> A Temporary Receiver . . . is necessary to review the books, including finances, accounting, operations, and potential (including a review of available credits and other governmental and tax programs/benefits) of Grand Prairie to determine whether, in the opinion of the Temporary Receiver, the company will reasonably be able to move forward based on its assets and potential credits.

About six weeks later, on March 31, the temporary receiver filed his report. The temporary receiver concluded that "it is clear [Grand Prairie] cannot pay its debts as they become due." Further, the temporary receiver concluded that "in [his] opinion, the Groundwater Credits have no commercial value." This factual finding is disputed in an affidavit Bogard filed. Finally, the temporary receiver conducted an analysis of the value of Grand Prairie's real property and leases and concluded that "it is clear that [Grand Prairie] is insolvent and has no going concern value." This is in contrast to Bogard's statement in his affidavit that Grand Prairie's hard assets are worth more than its debts.

4

After the receiver filed his report, the appellants filed a supplement to their response to the summary-judgment motion to address the disputed facts in the temporary receiver's report. In that response, the appellants argued that the temporary receiver was wrong about certain facts in his report and that there were issues of disputed material fact, regardless of whether the circuit court planned to consider the report when deciding summary judgment.

On May 2, the circuit court held a second hearing on the summary-judgment motion. During that hearing, the circuit court announced that it was granting the motion, dissolving Grand Prairie, and appointing a receiver to wind up the company's affairs. In announcing this ruling, the circuit court said,

> [T]he Temporary Receiver that I appointed . . . was for me, for my purposes, so that I could gain an understanding of a very complicated issue; but I needed to know whether or not those water credits were something that could be used, right now, to pay these bills. . . . and that's part of the motion for summary judgment and part of what the Plaintiff is arguing, is whether or not it's reasonably practical to move forward, because those payments cannot be made on a yearly basis.

The circuit court entered its order granting partial summary judgment on June 1. The circuit court does not explain in the order why it held that there were no genuine issues of material fact regarding dissolution or appointment of a receiver. However, the order states, "The Court's ruling and statements from the bench on May 2, 2023, is incorporated herein." The order also notes, "In its ruling, the Court considered the Temporary Receiver's report filed of record on March 31, 2023, for the purpose of understanding the marketability of the water credits which was a primary basis for forming the company."

5

The circuit court entered an amended summary-judgment order on June 6 to include a certificate that complies with Arkansas Rule of Civil Procedure 54(b).

This appeal timely followed.

## II. *Analysis*

Our standard of review for summary-judgment cases is well settled. The moving party always has the burden of showing that there are no genuine issues of material fact to be litigated.[1] Once the movant has established a prima facie entitlement, the opposing party must meet proof with proof to demonstrate the existence of a material issue of fact.[2] On appeal, we view the evidence in the light most favorable to the opposing party, resolving all doubts and inferences against the moving party, and this review focuses not only on the pleadings but also on the affidavits and other documents filed by the parties.[3]

The appellants argue, and we agree, that summary judgment was premature because the parties had no time to conduct discovery.

First, Rule 56 allows a circuit court to deny the motion for summary judgment and allow more discovery to be taken:

> (f) *When Affidavits Are Unavailable*. Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to

---

[1] *Reid v. Miller Ag Leveling, LLC*, 2025 Ark. App. 22, at 5, 704 S.W.3d 659, 663.

[2] *Id.* at 6, 704 S.W.3d at 663.

[3] *Id.*

be obtained or depositions to be taken or discovery to be had or may make such other order as is just.[4]

The appellants here submitted an affidavit with their response stating that they needed time to conduct discovery and listing some examples of what they needed. They also made these arguments at both summary-judgment hearings.

This case is similar to *Pledger v. Carrick*.[5] In *Pledger*, a woman was treated by a doctor for abdominal pain that was diagnosed as diverticulitis. The woman died of colon cancer approximately eighteen months after her final visit with the doctor who had diagnosed her with diverticulitis.[6] Although the *Pledger* opinion does not detail the precise timeline, the woman's estate filed a complaint against the doctor. The doctor moved for summary judgment on the ground that the statute of limitations barred the lawsuit, and the circuit court granted summary judgment.[7] In responding to the summary-judgment motion, the estate noted that the statute of limitations should be tolled due to the continuous-care doctrine. The estate further argued that summary judgment was premature because it did not have an opportunity to complete discovery that "would have allowed [the estate] to develop, if obtainable, the necessary proof in this case."[8] The supreme court noted:

---

[4]Ark. R. Civ. P. 56(f).

[5]362 Ark. 182, 208 S.W.3d 100 (2005).

[6]*Id.* at 186–87, 208 S.W.3d at 101–02.

[7]*Id.* at 187, 208 S.W.3d at 102.

[8]*Id.* at 192, 208 S.W.3d at 105.

> [B]efore rendering judgment the [circuit court] must be satisfied not only that there is no issue as to any material fact, but also that the moving party is entitled to a judgment as a matter of law. Where, as in this case, the decision of a question of law by the [circuit court] depends upon an inquiry into the surrounding facts and circumstances, the [circuit court] should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the [circuit court] to be reasonably certain that it is making a correct determination of the question of law.[9]

The supreme court went on to reverse the summary-judgment order in *Pledger*, holding that it had been entered prematurely "because the facts in this case were not sufficiently developed for the circuit court to determine whether summary judgment was appropriate" and that the circuit court had abused its discretion before allowing the estate to complete crucial discovery.[10]

In this case, the appellees filed the lawsuit on November 18. They filed their motion for summary judgment less than a month later, on December 16. This was before the appellants had even answered the complaint. Although the appellants timely responded to the motion for summary judgment, they noted in the response that they needed to conduct a great deal of discovery before being able to fully respond. During the hearing on the motion, they argued that a ruling was premature since they had not been able to depose Winemiller because they were waiting for financial documents that had been subpoenaed and for Winemiller's responses to discovery requests. The parties appear to have been

---

[9]*Id.* (quoting *First Nat'l Bank v. Newport Hosp. & Clinic, Inc.*, 281 Ark. 332, 663 S.W.2d 742 (1984)).

[10]*Id.* at 193, 208 S.W.3d at 106.

diligently pursuing discovery and providing information to various accountants and the temporary receiver, and it is clear the appellants were not delaying discovery.

The circuit court itself seemed to agree that there had not been time to sufficiently develop facts because it appointed a temporary receiver explicitly to discover and report facts about the water credits and other Grand Prairie assets that were central to the claims alleged in the complaint.

Likewise, there was no time for the parties to conduct discovery regarding the appointment of a receiver to wind up the company's affairs.

As in *Pledger*, the appellants here did not have time to develop the necessary proof on the issues to be litigated. Because the circuit court's ruling on the summary-judgment motion was premature, we reverse and remand.

Reversed and remanded.

GLADWIN and BARRETT, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*; and *Campbell & Grooms, PLLC*, by: *Kendel Grooms*, for appellants.

*Davidson Law Firm*, by: *Charles Darwin "Skip" Davidson, Stephen L. Gershner*, and *Deven Kyle Harvison*; and *Robert S. Tschiemer*, for appellees.